**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**CAROL ANN JOHNSTON,**

      **Plaintiff,**

**vs.**                        **Case No.  1:12-CV-227-WS/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

      **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

      This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration (SSA) denying Plaintiff's applications for a period of disability and Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).  After careful consideration of the entire Record, it is recommended that the decision of the Commissioner be affirmed.

**I.  Procedural History of the Case**

      On June 22, 2010, Plaintiff, Carol Ann Johnston, filed a Title II application for a period of disability and DIB and a Title XVI application for SSI alleging disability beginning October 31, 2009, due to back injury, migraine headaches, wrist problems, depression, bronchitis, and asthma.  R. 21, 247-52, 283.  (Citations to the Record shall

be by the symbol ("R.") followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured, or the date by which his disability must have commenced in order to receive DIB under Title II, is December 31, 2013.  R. 21.

Plaintiff's applications were denied initially on October 29, 2010, and upon reconsideration on January 28, 2011.  R. 21.  On March 10, 2011, Plaintiff requested a hearing.  R. 21.  On January 13, 2012, Plaintiff appeared and testified at a hearing conducted in Jacksonville, Florida, by Administrative Law Judge (ALJ) Brendan F. Flanagan.  R. 21, 49-95.  A. Mark Capps, MS, CRC, CVE, an impartial vocational expert, testified during the hearing.  R. 21, 96-100, 238-39 (Resume).  Plaintiff was represented by Elizabeth F. Stakenborg, an attorney.  R. 21, 40-43, 127-28.

On February 29, 2012, the ALJ issued a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from October 31, 2009, through the date of the ALJ's decision.  R. 31.  On March 22, 2012, Plaintiff requested review of this decision, R. 5,15-17, 415-19 (post-hearing brief), 712-15 (post-hearing patient records), which the Appeals Council considered and denied on August 13, 2012.  R. 1-5.  The ALJ's decision stands as the final decision of the Commissioner.

On October 5, 2012, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 14 and 16, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1.  "The claimant meets the insured status requirements of the Social Security Act through December 31, 2013."  R. 23.

2. "The claimant has not engaged in substantial gainful activity since October 31, 2009, the alleged onset date." R. 23.

3. "The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, major depressive disorder, posttraumatic stress disorder (PTSD)." R. 23.

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 25.

5. "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) involving lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; and, in an 8-hour workday, sitting, standing, and/or walking up to 6 hours each. Within these weight limits, the claimant's ability to push/pull is unlimited. The claimant can occasionally climb ramps, stairs, ropes, ladders, or scaffolds, and crouch. The claimant is able to concentrate and persist for 2-hour segments, take a short break of 1-2 minutes and then resume activity. The claimant is limited to work that requires no more than frequent interaction with crowds, public, or co-workers." R. 26.

6. "The claimant is capable of performing past relevant work as a lens fabricating machine tender, [lens generating] supervisor, and administrative clerk. This work does not require the performance of work-related activities precluded by the claimant's [RFC]." These jobs are light, semi-skilled work with a SVP of 4, 7, and 4, respectively. R. 30-31.

7. "The claimant has not been under a disability, as defined in the Social Security Act, from October 31, 2009, through the date of this decision." R. 31.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual

findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the

evidence or substitute its own judgment for that of the ALJ even if it finds that the

evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[1]

"In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

---

[1] "If the Commissioner's decision is supported by substantial evidence we must
affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232,
1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard,
however, does not permit a court to uphold the Secretary's decision by referring only to
those parts of the record which support the ALJ. A reviewing court must view the entire
record and take account of evidence in the record which detracts from the evidence
relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).
"Unless the Secretary has analyzed all evidence and has sufficiently explained the
weight he has given to obviously probative exhibits, to say that his decision is supported
by substantial evidence approaches an abdication of the court's 'duty to scrutinize the
record as a whole to determine whether the conclusions reached are rational.'" Cowart
v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 404.1509, 416.909 (duration

requirement). Both the "impairment" and the "inability" must be expected to last not less

than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or
equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have any impairments which prevent past
relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits. A positive finding at step three results in approval of the

application for benefits. At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work. Consideration

is given to the assessment of the claimant's RFC and the claimant's past relevant work.

If the claimant can still do past relevant work, there will be a finding that the claimant is

not disabled. If the claimant carries this burden, however, the burden shifts to the

Commissioner at step five to establish that despite the claimant's impairments, the

claimant is able to perform other work in the national economy in light of the claimant's

RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel,

190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen,

786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), (e) & (g), 416.

920(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the

medical opinions of the record resolving conflicts that might appear.  20 C.F.R. §§

404.1527, 416.927.  When considering medical opinions, the following factors apply for

determining the weight to give to any medical opinion: (1) the frequency of examination

and the length, nature, extent of the treatment relationship; (2) the evidence in support

of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support

an opinion, particularly medical signs and laboratory findings, the more weight" that

opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether

the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5)

other relevant but unspecified factors.  20 C.F.R. §§ 404.1527(b) & (c), 416.927(b) &

(c).

The opinion of the claimant's treating physician must be accorded considerable

weight by the Commissioner unless good cause is shown to the contrary.  Lewis v.

Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians

"are likely to be the medical professionals most able to provide a detailed, longitudinal

picture of your medical impairment(s) and may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings alone or

from reports of individual examinations, such as consultative examinations or brief

hospitalizations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  "This requires a

relationship of both duration and frequency."  Doyal v. Barnhart, 331 F.3d 758, 762

(10th Cir. 2003). "'The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.' *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)." *Id.*

> As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit that [sic] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration." *Black & Decker Disability Plan v. Nord*, [538 U.S. 822, 832 (2003)]. Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.
>
> A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source. Absent an indication than an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

Doyal, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat

differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis, 125 F.3d a1436, 1440 (11th Cir. 1997); Edward, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

## IV.  The Evidence

### A.  Medical Evidence

In September 2006, Plaintiff sustained a fracture of her left upper extremity radius.  R. 420-49, 546-62.  She had a surgical repair of her fracture as well as formal decompression of the carpal canal (left carpal tunnel release) due to resulting nerve symptoms.  R. 427-46.  As of November 2006, she was advised she could return to work with light-duty, no lifting greater than five pounds with the left hand, and no twisting of the left-hand.  R. 441.

On September 28, 2007, Plaintiff injured her right wrist.  R. 474-80.  An x-ray showed a comminuted distal radius fracture of the right wrist.  *Id.*  In October 2007, Plaintiff was treated by Dr. Dell and underwent surgery for her fracture.  R. 474-73.

On August 30, 2009, shortly before her alleged onset date, Plaintiff was treated at the Wheeling Emergency Room for low back pain that she had for two days.  R. 452.  She reported doing a lot of lifting and could not get out of bed.  No known injury is noted.  R. 454.  Under the musculoskeletal entry, it is noted that Plaintiff's strength is 5/5; gait normal; no limitation as to range of motion indicated; no indication of radicular pain; and a handwritten notation--pain getting out of bed.  The impression is lumbar muscle strain.  Plaintiff was given Valium 5 mg by IV and Oxycodone by mouth.  R. 453.

On January 6, 2010, Plaintiff was treated at the Citrus County Health Department (CCHD) for back pain.  R. 534.  She reported falling down the steps, landing on her tailbone, and hitting her right wrist and right elbow.  These events occurred two days prior.  Examination revealed pain to palpation of her right thorax and sacrum.  She was diagnosed with back pain and prescribed Meloxicam and Methocarbonal.  She was told to apply ice and heat and to return if there was no improvement.  A handwritten note states: no loss of back control.  Straight leg raising, NL gait, and range of motion were noted as positive.  R. 534.

On April 15, 2010, Plaintiff presented to the Shands at UF Emergency Department complaining of back pain.  R. 461-67.  She reported having right-sided back pain for several months and the pain had recently worsened.  R. 461.  The cause of the injury was unknown.  R. 461.  The symptoms were intermittent in nature, but currently present.  R. 461.  From a neurologic standpoint, Plaintiff was alert and oriented; her

motor and sensory exams were non-focal; and she moved all extremities.  R. 462.  The final impression was back pain.  Plaintiff was stable and discharged and prescribed Loratadine and Naprosyn.  Plaintiff left the facility without assistance.  R. 462, 465.

Between May and June 2010, Plaintiff was treated at the emergency department of Monroe Regional Medical Center for back pain.  R. 481-513.  During the May visit, a patient history was provided.  The onset of the problem had begun two weeks prior. R. 500.  Plaintiff had no trouble walking; no history of radiating pain; and no lower extremities weakness.  Plaintiff described her symptom as a dull nagging pain.  She was unaffected by movement or position.  Plaintiff stated she "occasionally has RUQ pain radiating ot [sic] back."  She described the pain as dull and aching--no aggravating or alleviating factors.  R. 500.  Plaintiff was taking Naprosyn.  R. 501.  A musculoskeletal examination revealed no extremity tenderness or edema.  R. 503.  Her mood and affect were normal.  R. 503.  It was also noted that Plaintiff complained of pain affecting her posterior chest wall and thoracic spine.  She described the pain as sharp.  There was no radiating pain.  Plaintiff received verbal instructions and/or educational material relating to pain, treatment goals, expectations, and care.  R. 504-5; *see* R. 506 (discharge instructions).  Plaintiff was discharged with prescriptions for Flexeril and Lodine.  Plaintiff was to arrange for a follow-up appointment with Heart of Florida, Clinic, in 3-5 days or immediately if her symptoms got worse.  R. 505.

On June 5, 2010, Plaintiff presented to the same emergency department complaining of rib and chest wall pain.  R. 486-97, 572-78.  She reported shortness of breath.  Neurological and musculoskeletal examinations were normal, including full range of motion in all extremities.  R. 488.  Plaintiff was discharged and prescribed

Percocet. R. 489. Discharge instructions included a statement that Plaintiff had a deep bruise. R. 489-90.

In August and September 2010, Plaintiff was treated at Heart of Florida Health Center for low back pain. R. 516-19, 531-33. In August, Plaintiff reported being pulled into a pool ten years ago and that she had had back pain intermittently since then. R. 516. Plaintiff denied tingling or numbness, but admitted back pain. R. 517. On examination, Plaintiff had moderate bilateral paraspinal muscle tenderness in the lumbar region; leg raise test was negative; CVA tenderness noted bilaterally. R. 517. Plaintiff had no joint or limb tenderness to palpation; no edema or ecchymosis present; and range of motion was normal with no joint crepitations present and no pain on motion in the lower extremities. R. 517. Her gait was normal and mood and affect also normal. R. 518. Plaintiff was prescribed Septra, Ibuprofen, and Cyclobenzaprine. She was instructed to alternate heat and ice, increase fluids, no heavy lifting, and to return in two weeks. R. 518. A lumbar spine x-ray taken on August 31, 2010, showed disc space narrowing at L4-5 and L5-S1 levels. R. 519, 650.

On September 14, 2010, Plaintiff had a two-week recheck. R. 531. Plaintiff reported her back pain was unchanged and muscle relaxers helped a little, but not much. R. 531. Naprosyn was prescribed, but Cyclobenzaprine and Ibuprofen were discontinued. R. 532-33.

On October 15, 2010, at the request of the state agency, Samer Choksi, M.D. performed a consultative examination of Plaintiff. R 521-24. Plaintiff's chief complaints were back pain with radiculopathy and bilateral wrist pain and weakness. R. 521. After the examination, Dr. Choksi provided a functional assessment:

Neck examination is within normal limits. There is limited range of motion of the back as noted. There is normal lordotic curve. The provider did not feel that the applicant was putting forth her best effort with range of motion testing; however, range of motion increased when both extremities were performed at the same time. Fine motor skills are all intact to the digits on both hands. Neurological examination appears to be intact. The applicant did appear to be attempting to give her best effort with strength testing.

R. 524. (**THORACUOLUBAR**: No scoliosis or increased kyphosis. ***Range of motion, Lumbar spine: Flexion forward 0-80°; extension 0-20°; lateral flexion right and left 0-15***°. R. 523.) Plaintiff's gait was normal; she was able to squat and heel-to-toe walk; straight-leg raise was normal; and she walked without assistance or an assistive device. R. 523. Dr. Choksi's diagnostic impression was history of chronic back pain and history of bilateral wrist and hand pain. R. 524.

Between January 26, 2011, and September 14, 2011, Plaintiff was treated at the CCHD for low back pain. R. 653-58. On January 26, 2011, presented with back pain and reported being out of her relaxers. Her blood pressure was elevated. Plaintiff was diagnosed with a herniated disc at L5 and hypertension, and prescribed Flexeril, Lidoderm patch, Lisinopril, and Tramadol. R. 658.

On July 20, 2011, Plaintiff presented (via ambulance) to the emergency department of Shands at the University of Florida complaining of back pain. Plaintiff stated that the pain increased after lifting packages of soda the prior day. R. 622. She was diagnosed with back pain and urinary tract infection, site not specified. R. 622. Plaintiff reported living in a shelter where she was required to perform household duties, including sweeping the floor and lifting objects. R. 624. (Plaintiff was a program participant at Another Way, Inc., a shelter and a 90-day program, from April 25, 2011, to August 6, 2011, R. 606, and thereafter. R. 614, 693.) The musculoskeletal examination

revealed that Plaintiff's range of motion was normal; she exhibited tenderness but no edema; exhibited tenderness and pain in her lumbar back, with normal range of motion, no bony tenderness; no edema and no spasm.  R. 625.  Plaintiff's mood and affect were normal.  R. 625.  Plaintiff reported doing better with pain control and was discharged. R. 625.

Plaintiff's back pain continued and on July 26, 2011, Plaintiff was referred for an MRI of her lower back and spine.  R. 656.  On July 28, 2011, a MRI of Plaintiff's lumbar spine indicated bilateral mild to moderate neural foraminal stenosis at L5/S1 secondary to a broad based intervertebral disc herniation and Modic Type II degenerative endplate changes at L5/S1.  R. 635.  On August 5, 2011, Plaintiff reported to CCHD that her pain was unbearable and had no relief with medication.  R. 655.  It appears that a physician assistant discussed the MRI results with Plaintiff and advised her to continue with conservative treatment and/or that she would could be a possible surgical candidate. Plaintiff declined any chiropractic treatment.  Plaintiff was prescribed Ibuprofen 800 mg, Flexeril 10 mg, and Prednisone.  R. 655.  On September 14, 2011, progress notes from CCHD indicated that Plaintiff had severe back pain that limited her movement.  R. 654. It was noted that Plaintiff "goes to Meridian" for "PTSD."  R. 654.

Plaintiff was treated at Meridian Behavioral Healthcare, Inc. (Meridian) for depression from June 2011 through November 2011, and was under the care of Gale Greeley, M.D., a psychiatrist.  R. 606-620, 689-706.  On June 14, 2011, at this initial evaluation that lasted 55 minutes, Plaintiff reported to Dr. Greeley being very depressed.  R. 616-20, 701-07.  She was tearful at times and reported a recent break up of a six-year relationship that was emotionally and physically abusive.  She could not

sleep or stand to be around noise or arguments, had nightmares, and could not make

decisions. Examinations revealed her mood was depressed, tearful, and anxious, and

her motor behavior was retarded. Her appearance was fair, speech normal, cognition

was grossly intact, insight and judgment were fair, affect was appropriate, denial of

homicidal/suicidal (HS) ideation, and thought process was logical. Plaintiff was

diagnosed with major depressive disorder, severe, post-traumatic stress disorder,

hypertension, and chronic back pain. She was assigned a current and "highest past

year" Global Assessment of Functioning (GAF) score of 35.[2] Plaintiff was started on

Celexa and Trazodone and to return in four weeks. The prognosis was fair. R. 607-10,

614-20, 701-06.

---

[2] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners. The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id. See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale). A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice. In order to provide a global measure of disability, the WHO DSM-5 (see the chapter "Assessment Measures")." DSM-5 at 16.

A second evaluation occurred on July 12, 2011, which lasted 20 minutes and no improvements in Plaintiff's depression are noted. Ativan was prescribed. R. 612-13, 699-700. As of August 9, 2011, the third evaluation, Plaintiff's mental status remained about the same. (This evaluation was 30 minutes. R. 697.) She remained in the shelter, was very traumatized by it, and was having difficulty concentrating. R. 614, 697. The objective assessments were similar to the June 2011 assessments, although her motor behavior was normal. R. 615, 698; *see* R. 695-96 (9/9/11 notes for the fourth evaluation lasting 15 minutes; insight was fair to good and judgment was good).

On August 9, 2011, Dr. Greeley completed a questionnaire regarding Plaintiff covering the period of June 14, 2011, until August 9, 2011. R. 607-10. Signs and symptoms are checked. Dr. Greeley reiterated Plaintiff's prior diagnoses, including the 35 GAF score and that her condition was expected to last at least 12 months. Dr. Greeley expected Plaintiff to miss work more than three days a month and that during a typical workday Plaintiff's symptoms would become severe enough to interfere with attention and concentration needed to perform even simple work tasks, but that the psychiatric condition did not exacerbate Plaintiff's pain or other symptoms. Dr. Greeley indicated that she did not have a full-scale IQ for Plaintiff. Plaintiff was not a malingerer. R. 607-08. Dr. Greeley offered no opinions (check marks) regarding Plaintiff's mental abilities and aptitude to do unskilled work. R. 609. Dr. Greeley opined (used check marks) that Plaintiff had marked functional limitations regarding difficulties maintaining social functioning and extreme functional limitations regarding difficulties of concentration, persistence or pace, but no opinion regarding her limitations for activities

of daily living and no episodes of decompensation. Plaintiff can manage her benefits in her own interest. No starting date was provided for the limitations. R. 610.

On September 27, 2011, Lance I. Chodosh, M.D., performed a consultative physical examination. R. 662-75. Plaintiff reported "disability secondary to 'back and bilateral wrist pain, CTS, migraine headaches, asthma, short of breath and depression.'" R. 672. Dr. Chodosh's examination of Plaintiff's back/spine revealed no deformity, tenderness, or paraspinal muscle spasm, and a straight-leg raising test (supine and sitting bilaterally) was negative to 90°. R. 674. A neurological examination revealed that Plaintiff had normal motor function and impact strength in her arms and legs; normal manual dexterity and grip, good coordination, and normal sensation. R. 674. Plaintiff's standing balance, gait, including heel and toe walk, were normal. R. 674. Plaintiff indicated an inability to squat and rise. R. 674. Dr. Chodosh reported a decreased range of motion of the cervical and lumbar spine on forward flexion, extension, lateral flexion, and rotation and shoulder forward elevation and adduction, but normal range of motion in all other categories. R. 662-64. Based only on the objective evidence, he also opined that Plaintiff was able to stand, walk, sit, bend at the waist, squat occasionally, kneel, lift, carry, handle objects, and hear and speak normally. R. 675, *see* R. 665-70. Nevertheless, Dr. Chodosh diagnosed Plaintiff with chronic pain, as described without physical signs of impairment; moderate obesity; history of depression, alcoholism, and current psychiatric care; and bilateral wrist pain after remote fractures, without physical signs of impairment. R. 675.

On November 4, 2011, at Plaintiff's fifth and final reported visit with Dr. Greeley (lasting 20 minutes), Plaintiff is reported not doing well and continued to live at the

shelter.  R. 693.  Plaintiff received a referral to case management and was to return in two-and-one half months.  The objective assessments were similar to prior assessments, except it was noted that Plaintiff "just wishes she weren't alive" under "H/S."  R. 694.

On November 14, 2011, at the referral of her attorney, Plaintiff attended a one-time psychological evaluation with Carmen Tozzo-Julian, Ph.D.  R. 679.  The purpose of the evaluation was to assess Plaintiff's level of functioning, to rule out an effective disorder and determine variables that are affecting her ability to work.  R. 679.  Plaintiff was cooperative and responded to all inquiries.  R. 680.  Her gait, posture, and motor behavior were normative.  Speech was fluent and expressive and receptive language were within the average range.  Plaintiff's attention was mildly impaired although she was alert and oriented to time, place and person.  Plaintiff was easily distracted by the noises outside the room and objects inside the room.  Memory functions were moderately impaired.  R. 680.  Thought processes were logical, coherent, and consistent with the subject matter and no obvious delusions.  Intelligence and verbal reasoning were estimated to be in the average range.  R. 681.  Plaintiff reported a history of depression for six years and symptoms were noted.  Plaintiff also reported a history of anxiety.  Plaintiff reported participating in individual therapy through Meridian and was also scheduled to begin group therapy.  R. 681.

Plaintiff reported pain level of seven to eight out of ten; able to bathe and dress independently, complete light housework, sit for five to ten minutes before feeling an increase in pain, to lift and carry five to ten pounds, and able to drive 30 minutes. R. 681.

Dr. Tozzo-Julian opined that the mental status examination indicated mild attentional deficits and moderate impairment on memory tasks and that these deficits were likely due to her current anxiety.  R. 681.  Dr. Tozzo-Julian also opined that Plaintiff's reported symptoms were consistent with Bipolar II Disorder and PTSD. R. 681.  Plaintiff strengths are the good prior work history and a supportive sister.  Her liabilities include chronic pain, depression, and anxiety.  R. 682.  Dr. Tozzo-Julian also opined:

> Prognosis is guarded.  [Plaintiff] reported limitations in her ability to sit, stand and walk for extended periods of time.  She cannot drive for long distances or operate heavy machinery because of reported chronic pain in her hands.  She is unable to produce quality work consistently because of attentional deficits.  She will have difficulty learning new tasks because of moderate memory deficits.  She is not likely to have problems getting along with supervisors or coworkers.  She will have problems working with the public and coping with every-day work stresses because of a history of anxiety.
>
> Recommendation[s] include: (1) [Plaintiff] reported a history of depression, mood swings and anxiety.  Individual therapy is recommended, which should include stress management.  Group therapy with other victims of domestic violence is also recommended.  (2) [Plaintiff] reported a history of back and hand pain.  Pain management is recommended to improve her quality of life.

> **Statement of Competency:**
>
> [Plaintiff] is not able to manage her finances because of her level of cognitive impairment.

R. 682.  Dr. Tozzo-Julian diagnosed Plaintiff with "Bipolar II Disorder, current episode: Major Depression and [PTSD]" and rated Plaintiff's current GAF score at 55.  R. 682; *see supra* n. 2.

On November 21, 2011, Dr. Tozzo-Julian also completed an impairment form. R. 684-87.  The diagnoses and GAF score were the same as on November 14.  R. 684. Numerous symptoms were identified with a check mark.  R. 684.  It was noted that

Plaintiff's attention was mildly impaired and memory moderately impaired and that Plaintiff appeared depressed and had difficulty focusing. R. 685. Her prognosis was guarded; Plaintiff's impairment lasted or could be expected to last at least 12 months; Plaintiff was considered to be very depressed and focused on negative aspects of life; Plaintiff's pain or other symptoms would frequently become severe enough to interfere with her attention and concentration need to perform even simple work tasks; Plaintiff could be expected to be absent from work about twice a month due to her impairments or treatment; and Plaintiff did not have a low IQ or reduced intellectual functioning. R. 685. On a section of the formed labeled "Mental Abilities and Aptitudes Needed to do Unskilled Work," Dr. Tozzo-Julian opined Plaintiff had fair to good mental abilities and aptitudes in all areas other than dealing with work stress, which she rated as "poor. R. 686. In the section labeled "Functional Limitation," Dr. Tozzo-Julian opined that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate deficiencies of concentration, persistence, or pace; one or two episodes of the decompensation; and that these limitations would have been in effect since November 2008. R. 687. Plaintiff could not manage benefits in her own best interest. R. 687. Dr. Tozzo-Julian did not expressly opine whether Plaintiff could perform her past relevant work.

After the ALJ entered her decision, Plaintiff's counsel provided the Appeals Council with additional patient records from CCHD. R. 5, 712-15. On January 4, 2012, Plaintiff was treated at the CCHD for low back pain. R. 711-13. Plaintiff reported low back pain with radiculopathy, stress, and was depressed while in the shelter. R. 711. Plaintiff was given a Depomedrol injection for back pain and was prescribed Lidoderm

patches and HCTZ for hypertension and was told to continue on Celexa and Trazodone for depression.  R. 711.

### B.  Testimony from the Vocational Expert

A. Mark Capps testified without objection as a vocational expert.  R. 96-100. Mr. Capps testified that Plaintiff's past relevant work as a lens fabricating machine tender was light and unskilled; her past relevant work as a supervisor was light and skilled; her past relevant work as an administrative clerk was light and semi-skilled; and her past relevant work as a machine setter was medium and skilled.  R. 96-97.  The ALJ asked Mr. Capps:

> Q  Let me have you assume that the claimant has the [RFC] to perform light work, that is lift or carry 20 pounds occasionally and 10 pounds frequently; stand or walk six hours and sit six hours in an eight-hour workday with unlimited push/pull capability within those weight limits of lifting and carrying; would be occasionally limited to climbing ramps or stairs and climbing ladders, ropes, and scaffolds, and occasional crouching; and just two mental limits--would be able to concentrate and persist in two-hour segments--take a short break and then resume, short break of a minute or two; and the work would be limited to frequent interaction with crowds, public, and coworkers.
>
>    Assuming these limits, can the claimant perform any of her past work as actually or as generally performed?

R. 97.  Mr. Capps opined that these limitations would eliminate the medium position as a machine setter, but not the other light occupations.  R. 97-98.  Mr. Capps was unclear how the ALJ arrived at the "two hours of ability to concentrate."  R. 98.  Mr. Capps used "the standard breaks," i.e., "take a break after two hours . . . of a four-hour schedule . . . and then resume for two more hours until your lunch break."  R. 98.  He did not believe Plaintiff's former supervisory position involved continuous interaction with coworkers. R. 98.

Mr. Capps was also asked to assume that the hypothetical person is not capable of performing at any exertional level for eight hours a day/40 hours a week or assume that the claimant has a substantial loss in the ability to perform at least one of the basic mental demands for unskilled work. Mr. Capps opined that the claimant could not perform any of her past relevant work. R. 98-99.

In response to inquiries from Plaintiff's attorney, Mr. Capps stated that excessive tardiness is in the same category with absenteeism as far as the frequency, i.e., two or more per month, if not correctable, would lead to termination. R. 99. If the hypothetical person needed more than the regular breaks at least two or three times in excess of what is standard, then the employer would need to modify the job requirements to allow that. R. 100. Further, if the hypothetical person had the same limitations presented by the ALJ and added that the hypothetical person had only occasional use of the upper extremities, that factor would significantly impact the number of jobs available because approximately 94% of the jobs require frequent reaching and handling. R. 100.

### C. Plaintiff's Hearing Testimony

Plaintiff testified during the hearing. R. 49-95. Plaintiff was born in 1955, and graduated from high school. R. 51-52. As of the hearing date, Plaintiff had lived in a shelter for eight months. R. 50. She previously lived in a mobile home for approximately one year and in another mobile home nearby prior to that time. She had lived in the mobile homes with her ex-boyfriend. She is not married and has no children. R. 51.

Plaintiff has a driver's license and drives a 1998 automobile. R. 53. She visits her sister who lives about five miles from the shelter. Prior to the administrative

hearing, the shelter gave her a map and MapQuest (indicating 102 miles from the shelter to the hearing site in Jacksonville). She drove with her sister to the hearing. The trip took four hours. They got lost while driving 150 miles. Her sister gave her shortcuts. R. 53-54.

Plaintiff described her work history. R. 55-66. Plaintiff has not worked since 2009; she had been receiving unemployment compensation until she had to re-pay money due to an overpayment and the amount due was taken out of her unemployment check. She received unemployment benefits through approximately November 2010. R. 66-67. Plaintiff first applied for unemployment through Work Force. R. 67-68. Prior to receiving unemployment, Plaintiff had to look for a job. R. 68. She applied for several jobs without success. In fact, Plaintiff went door-to-door applying for jobs at stores and gas stations, although she was not hired. R. 68. She would have worked even though she was "really hurting" and claimed to be disabled. R. 69. She is receiving food stamps and her sister helps her by paying for gasoline and helps her with the doctor. R. 69, 84-85. Her doctor is approximately 30 miles from the shelter and she drives, accompanied by her sister. R. 69-70. While she was looking for work in 2010, Plaintiff also assisted an elderly couple at least two or three times a week. R. 71. She has not provided this assistance during the past three years. R. 71.

At the shelter, Plaintiff keeps her bedroom clean and helps with the kids if they need help. R. 73-74. She performs her personal care and does everything for herself except touch her toes. She sits down and slowly pulls her leg up to put on a shoe. R. 74-75. Food is provided; she does not cook, but cooked a lot, did housework, including laundry, making the beds, and cleaning dishes, prior to going to the shelter.

R. 75.  She also sewed by hand.  R. 76.  She had other interests including singing, dancing, camping, but these ended about six years ago.  R. 76-77.  She tries reading once in a while.  R. 77.  She stated that she last saw Dr. Greeley in November 2011 and typically saw her on prior occasions on a monthly basis for about half an hour or more. R. 79-80.

Plaintiff hurt herself the prior summer while lifting groceries.  R. 80-81.  Now, she could carry a gallon of milk in two hands, but she would not want to try to carry more-- she fears hurting her back.  R. 81.  She walks around the shelter.  She takes her sister shopping, e.g., to Walmart.  Her sister uses a cane.  R. 82.  Plaintiff shops at Walmart without using a motorized cart, but she leans on a buggy.  R. 82.  Plaintiff can stand on her feet for about 20 minutes before she has to sit down because of the pressure on her legs and back.  R. 83.  Other than going to Walmart, the doctor, and other described places, Plaintiff does not go to movies, restaurants, church, and other places outside the shelter--she would not be able to sit that long and cannot afford movies and restaurants.  R. 83.  Her sister pays for gas and sometimes for her doctor visits and medicines.  Plaintiff has no other source of funds.  R. 69, 84-85.  Plaintiff described her medications.  R. 85-87.  She takes Celexa every day and Trazodone when she feels bad.  R. 85-86.

Plaintiff stated she could not work because she cannot do the things she once did.  R. 87.  She is not able to sit or stand for any length of time because of pain felt from her back down into her butt.  She also feels she cannot concentrate.  R. 87-88. Plaintiff is left-handed and has problems lifting under ten pounds.  R. 88.  She gets cramps in her arms and then drops things.  She has had this problem for three days

lately.  R. 89-90.  She gets migraines once a week or every two weeks.  She takes

Excedrin, but took another mediation previously, but can no longer afford it.  R. 90.  The

doctor told her to go to pain management and to have surgery, but she has not gone to

any doctor in these fields because she cannot afford the services and has no money for

medicine.  R. 90-91.[3]

Over the last eight months, Plaintiff received three certificates in courses given at

the shelter for domestic violence, self-esteem, and parenting.  R. 93-94.  She is

currently taking a course in financial empowerment to help her after she leaves the

shelter.  R. 94.  She goes to classes about an hour to an hour and a half every week

and does her own reading.  R. 95.

Prior to receiving treatment at Meridian, Plaintiff had not seen a psychiatrist or

mental health counselor.  R. 95.

The ALJ summarized part of Plaintiff's testimony:

> At the hearing, the claimant testified she was unable to work because she could
> no longer do the things she once could.  She said she could no longer sit or
> stand for any length of time, left with her hands, or concentrate.  She reported
> pain in her back and buttocks as well as sciatic pain down her legs when sitting
> or standing too long.  She stated that she had cramps in her arms and hands,
> and could not grip or lift.  She estimated that she could sit for 10 minutes before
> having to get up and around, or stand about 20 minutes before having to sit down
> because of pressure on her legs from her back.

> The claimant testified that since the alleged onset date of disability she could
> care for her personal hygiene, prepare meals, perform household chores, help
> with childcare, read, shop, and drive.

R. 27.

---

[3]  Plaintiff did not state that she sought out and was unable to obtain medical
treatment and medications from, e.g., CCHD or another healthcare provider,
notwithstanding her financial status.  *See* Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir.
1999).  There is no persuasive evidence that Plaintiff was denied medical treatment due
to lack of funds.  R. 28 (ALJ's findings regarding Plaintiff's inability to pay for medication
and medical services); *see* Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005).

**VI. Legal Analysis**

    **A. Issues Presented**

Plaintiff raises three issues for consideration: (1) whether the ALJ erred in not explaining why he did not accept all of the opinions of Dr. Tozzo-Julian, a psychologist, regarding Plaintiff's RFC despite affording greater weight to her opinions; (2) whether the ALJ erred in not providing good cause for not crediting the opinion of Dr. Greeley, Plaintiff's treating psychiatrist; and (3) whether the ALJ's conclusions regarding Plaintiff's RFC are internally inconsistent.[4]

    **B. Substantial Evidence Supports the ALJ's consideration of the opinions of Drs. Tozzo-Julian and Greeley**

Plaintiff alleges that her disability began on October 31, 2009. R 21. Plaintiff reported having problems with depression for several years (six years reported to Dr. Tozzo-Julian on November 14, 2011, R. 681) prior to and after the alleged onset date. It was not until June 14, 2011, when Plaintiff first sought and received evaluations and treatment from Dr. Greeley for a mental impairment at Meridian. R. 24, 606-620, 689-708. (The ALJ noted that "the record fails to document any evaluation or treatment of a mental health condition until June 2011. R. 29.) The initial session on June 14 lasted 55 minutes. R. 701. Later sessions on July 12, 2011, August 9, 2011, and November 4, 2011, the last session at Meridian, lasted approximately 15-30 minutes each. R. 693-700.

The ALJ summarized the treatment notes from Dr. Greeley:

> In terms of the claimant's mental health impairments, the record fails to document any evaluation or treatment of a mental health condition until June 2011. At that time, the claimant had recently terminated and abusive 6-year

---

[4] Issues one and two are connected and will be considered together under section B.

relationship and had been in a shelter for 1 1/2 months. She found shelter-life quite traumatizing and was uncomfortable with loud noises and discord between other residents. She stated that she did not feel safe at the shelter. The claimant was diagnosed with major depressive disorder, severe, single episode and [PTSD]. Treatment records reflect monthly medication management appointments of 15-30 minutes duration with limited response to psychotropic medication use through November 2011, the last documented appointment (Exhibit 28F).

. . . .

On August 9, 2011, Dr. Greeley reported the claimant had marked difficulties in maintaining social functioning and extreme deficiencies in concentration, persistence, and pace (Exhibit 19). The undersigned gives limited weight to this opinion as it was completed on only the claimant's third visit with the author and, as previously noted, those visits were brief. Further, the claimant's actual level of functioning far exceeds Dr. Greeley's report. Although Dr. Greeley reported the claimant had extreme deficiencies in concentration, persistence, and pace, the claimant reported that she drove on a daily basis; in fact, the claimant spent four hours driving to the hearing, including interstate highways, which demonstrates the capability to concentrate and persist. The undersigned agrees the claimant has some limitations in the area of concentration, persistence, and pace, but not to the marked level as reported by Dr. Greeley (Exhibit 27).

R. 29-30.[5]

At the request of Plaintiff's attorney, on November 14, 2011, Plaintiff attended a one-time psychological evaluation with Dr. Tozzo-Julian, a psychologist. R. 679. The purpose of Dr. Tozzo-Julian's evaluation was to assess Plaintiff's level of functioning, to rule out an affective disorder and determine variables that are affecting her ability to work. R. 679. The ALJ considered this evaluation. R. 29-30.

Results of the mental status examination found the claimant had mild attentional deficits and moderate impairment on memory tasks, thought likely due to anxiety. Dr. Tozzo-Julian found the claimant's reported symptoms consistent with Bipolar II Disorder, current episode of major depression, and PTSD (Exhibit 26F). In an associated Medical Source Statement, Dr. Tozzo-Julian found the claimant had

---

[5]  Plaintiff correctly notes that Plaintiff drove to the hearing in four hours, but she got lost which contributed to the delay. Doc. 14 at 17; R. 53-54. As noted by Plaintiff: "She blamed getting lost on her passenger [her sister] but either way, she was the driver and getting lost and almost tripling the travel time certainly cannot reasonably be used as an example of *good concentration*." Doc. 14 at 17.

mild restriction of activities of daily living and difficulties maintaining social functioning, moderate deficiencies of concentration, persistence, or pace, and 1-2 episodes of decompensation. Further, Dr. Tozzo-Julian found the claimant had fair to good mental abilities and aptitudes needed to perform unskilled work in all categories other than dealing with work stress, which she is rated as poor (Exhibit 27).

. . . .

The undersigned finds Dr. Tozzo-Julian's conclusions are more consistent with the claimant's level of functioning. In the area of social functioning, the record reflects the claimant maintained a close relationship with her sister, provided regular assistance to an elderly couple, including taking them to medical appointments, and help other residents with childcare at the shelter. She reportedly got along with authority figures, and had never been fired or laid off from a job because of problems getting along with others. The undersigned finds these activities demonstrate no more than a mild limitation in social functioning as reported by Dr. Tozzo-Julian, not a marked degree of limitation as reported by Dr. Greeley.

R. 29-30. These findings are supported by Dr. Tozzo-Julian's evaluation notes. R. 679-87; *see supra* at 17-19.

Specifically, on a section of the form labeled "Mental Abilities and Aptitudes Needed to do Unskilled Work," Dr. Tozzo-Julian opined Plaintiff had fair to good mental abilities and aptitudes in all areas other than dealing with work stress, which she rated as "poor." R. 686. In the section labeled "Functional Limitation," Dr. Tozzo-Julian opined that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate deficiencies of concentration, persistence, or pace; one or two episodes of the decompensation; and that these limitations would have been in effect since November 2008. R. 687. Plaintiff could not manage benefits in her own best interest. R. 687. Dr. Greeley opined she could. R. 610.

The ALJ gave "little weight to the opinion of Dr. Greeley as it is not consistent with the claimant's actual level of functioning or the opinion of Dr. Tozzo-Julian. Greater

weight is provided to the opinion of Dr. Tozzo-Julian, as it is more consistent with the demonstrated activities of the claimant and is better supported by the record as a whole." R. 30.

Plaintiff argues that the ALJ did not explain why he did not adopt Dr. Tozzo-Julian's opinion as to Plaintiff's limitation, "including her limitations to unskilled work which would have precluded her ability to do any of her past work which was all semi-skilled or skilled in nature and would have resulted in a finding of disability under the Medical Vocational Guidelines [the Grids]." Doc. 14 at 10.

Dr. Tozzo-Julian did not opine that Plaintiff was limited solely to unskilled work and she did not expressly opine whether Plaintiff could perform her past relevant work or whether she could perform any work at the light, skilled, or semi-skilled level. Rather, on a section of the form labeled "Mental Abilities and Aptitudes Needed to do Unskilled Work," Dr. Tozzo-Julian opined Plaintiff had fair to good mental abilities and aptitudes in all areas other than dealing with work stress, which she rated as poor. R. 686. In the section labeled "Functional Limitation," Dr. Tozzo-Julian opined that Plaintiff had *mild* restriction of activities of daily living; *mild* difficulties in maintaining social functioning; *moderate* deficiencies of concentration, persistence, or pace; *one or two episodes of the decompensation*; and that these limitations would have been in effect since November 2008. R. 687. The form was limited and did not request an opinion regarding Plaintiff's ability and aptitude to do light skilled or semi-skilled work (work that that the ALJ found Plaintiff could do, R. 30-31).

Although it is true that the ALJ did not discuss all of Dr. Tozzo-Julian's findings and opinions, he sufficiently discussed them in order for the reviewing court to

determine the basis for the weight the ALJ gave to the doctor's opinions.  Even though the doctor's prognosis was "guarded" and she made several other observations not expressly discussed by the ALJ, such as that Plaintiff "is unable to produce quality work consistently because of emotional deficits" and that Plaintiff "will have difficulty learning new tasks because of moderate deficits," the doctor also opined that the "[m]ental status examination indicated *mild* attentional deficits and *moderate* impairment on memory tasks."  R. 681 (emphasis added).  Further, the ALJ adopted Dr. Tozzo-Julian's opinions that Plaintiff had *mild* restriction of activities of daily living; *mild* difficulties in maintaining social functioning; *moderate* deficiencies of concentration, persistence, or pace.  R. 29, 687.  The ALJ gave Plaintiff the benefit of the doubt regarding reported and found mental limitations and included restrictions "that allow for [Plaintiff's] recently diagnosed mental health condition in the [RFC] assessment."  R. 24, 26.

Prior to June 2011, although Plaintiff reported being depressed for about six years and receiving sporadic treatment at various health care providers, Plaintiff did not seek medical assistance for her depression or any other mental health condition, a point not lost on the ALJ.  R. 29, 95.  In June 2011, Plaintiff was evaluated by Dr. Greeley and reported a recently terminated abusive six-year relationship and reported living in a shelter for one-and-half months.  R. 29, 793.  Plaintiff found shelter-life quite traumatizing and was uncomfortable with the loud noises and discord between other residents.  She stated that she did not feel safe at the shelter.  After a 55-minute interview, Plaintiff was diagnosed with major depressive disorder, severe, single episode, and PTSD.  Prognosis was fair and Plaintiff received a GAF score of 35.  R. 706; *see* R. 705 for other ratings.

Plaintiff met with Dr. Greeley on July 12, 2011, for 20 minutes and was reported as not making any improvement in her depression.  R. 699-700.  On August 9, 2011, after a 30-minute visit (the third), Dr. Greeley reported Plaintiff had marked difficulties in maintaining social functioning and extreme deficiencies in concentration, persistence and pace.  R. 607-10, 697-98.  (Dr. Greeley did not check any boxes under the heading "Mental Abilities and Aptitude to do Unskilled Work.  R. 609; *see* R. 48 (ALJ generally questioning whether an inference could be drawn when there is no limitation found).[6]

The ALJ explained that he gave only limited weight to Dr. Greeley's August 9, 2011, opinion of essentially disabling mental limitations because "it was completed on only the claimant's third visit" and "those visits were brief."  R. 30; *see supra* n.6.   The ALJ also found Dr. Greeley's opinion inconsistent with Dr. Tozzo-Julian's findings and with Plaintiff's greater level of functioning in her daily activities.  R. 30.  As noted above, Dr. Tozzo-Julian reported fairly unremarkable results on a mental status examination and opined Plaintiff had only mild difficulties in maintaining social functioning and moderate deficiencies of concentration, persistence or pace.
R. 687.

Dr. Greeley also reported rather standard findings on a mental status examination, noting that Plaintiff had good activities of daily living, normal motor behavior and speech, intact cognition, logical though processes, no suicidal/homicidal

---

[6]  The ALJ questioned whether Dr. Greeley's opinion was entitled to deference as a treating physician because she examined Plaintiff on only three occasions at the time these opinions were rendered on August 9, 2011.  R. 30.  As noted herein, the ALJ is required to consider several factors when assessing the opinion of treating physicians and other medical source opinions, including but not limited to the examining and treating relationship, the length of the treatment relationship and the frequency of examination.  20 C.F.R. §§ 404.1502 (definition of treating source), 404.902 (same); 20 C.F.R. §§ 404.1527(c)(1), (2) (i)-(ii), 416.927(c)(1), (2) (i)-(ii); *see supra* at 6-8.  Here, Dr. Greeley is considered a treating physician.

ideation (except on November 4, 2011, when Plaintiff reported "just wishes she weren't alive"), fair to good insight, and fair to good judgment.  R. 694, 696, 698, 700, 705. Aside from Dr. Greeley routinely noting that Plaintiff was depressed or very depressed and anxious, these fairly normal mental status examination findings were inconsistent with Dr. Greeley's opinion that Plaintiff had marked difficulties in maintaining social functioning and extreme deficiencies of concentration, persistence or pace.

Additionally, aside from getting lost when traveling to the hearing with her sister, Plaintiff reported few to no difficulties driving 30 miles, assisting an elderly couple with getting to their appointments, helping other women at the shelter and caring for their children, maintaining her living space at the shelter, and registering with Work Force and going door-to-door looking for work.  R. 53-54, 66-68, 71-76, 82-83; *see* R. 30. Plaintiff testified that she was ready, willing, and able to work--she simply was unable to find a job at stores and gas stations in the area where she lived.  R. 66-69.  Substantial evidence supports the ALJ's conclusion that these daily activities conflicted with Dr. Greeley's opinion that Plaintiff suffered from disabling limitations.[7]

The evidence showed that Plaintiff's mental health symptoms were largely related to situational stressors, such as Plaintiff's recent break-up from a long-term abusive relationship and subsequent move into a domestic violence shelter where she did not feel safe.  R. 697-98.  Even with the mental symptoms brought on by her situational stressors, Plaintiff required no psychiatric hospitalizations, and her sole

---

[7]  The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i).  *But see* Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

treatment was monthly medication management appointments (of short duration) with Dr. Greeley. R. 689-709. During her appointments, Dr. Greeley noted fairly normal mental status examination. R. 696. At her one-time evaluation, Dr. Tozzo-Julian reported fairly unremarkable findings, including that Plaintiff had some mild attention deficits and a moderate memory impairment due to situational anxiety, but otherwise had normal though processes and speech, and average verbal reasoning skills and intelligence. R. 680-81. Dr. Tozzo-Julian rated Plaintiff's GAF score at 55, indicating only moderate psychological symptoms. R. 682; *see supra* n. 2.

Based on all of the evidence, the ALJ reasonably found that Plaintiff had the mental RFC to perform work that allowed her to concentrate and persist for two-hour segments with one-to-two minute breaks and that did not require more than frequent interaction with crowds, the public, or coworkers. R. 26. These findings are consistent with Dr. Tozzo-Julian's finding that Plaintiff had mild to moderate problems with her attention and memory and problems working with the public due to her history of anxiety. R. 680-82. Dr. Tozzo-Julian also found that Plaintiff would not likely have problems getting along with supervisors or coworkers, although she would have problems working with the public and coping with everyday work stressors because of her history of anxiety. R. 682. (The ALJ acknowledged in his RFC assessment that Plaintiff "is limited to work that requires no more than frequent interaction with crowds, public, or co-workers." R. 26.)

Based on the foregoing, substantial evidence supports the ALJ's consideration of and the weight given to Dr. Tozzo-Julian's and Dr. Greeley opinions. Plaintiff's arguments to contrary should be rejected.

## C. Substantial Evidence supports the ALJ's RFC Assessment

Plaintiff also argues the ALJ's conclusions concerning her RFC are internally inconsistent. Doc. 14 at 17-20. As explained below, substantial evidence supports the physical components of the ALJ's RFC assessment, finding that Plaintiff was physically capable of performing light work. R. 26.

Except for periods of increased symptoms, Plaintiff's physical examinations revealed minimal objective findings over the course of her treatment. Diagnostic studies did not reveal evidence of any disease process significant enough to preclude Plaintiff from performing a limited range of light work. R. 28. For example, Plaintiff was seen at the emergency room in May 2010 complaining of back pain. The attending physician reported that a physical examination was essentially normal, with no motor or sensory deficits. R. 503. In October 2010, Dr. Choksi reported that a neurological examination was normal, with no motor or sensory deficits and a negative straight-leg raising test. R. 521-24. Dr. Choksi also reported that Plaintiff's gait was normal and Plaintiff was able to squat and heel-to-toe walk. R. 523. Plaintiff demonstrated some limitation of motion of her lumbar spine. Dr. Choksi, however, felt that Plaintiff did not put forth her best effort with range of motion testing. R. 523-24. In July 2011, after Plaintiff suffered an episode of acute back pain resulting from lifting heavy groceries, an emergency room physician reported that despite that Plaintiff's lumbar spine was painful and tender, her range of motion was normal with no bony tenderness, swelling, edema, or spasm. R. 625. In September 2011, Dr. Chodosh reported that Plaintiff's gait and station were normal and a neurological examination revealed that Plaintiff had normal motor function and intact strength in her arms and legs; normal manual dexterity and

grip; good coordination; and normal sensation.  The back/spine examination revealed no deformity, tenderness, or paraspinal muscular spasm; straight-leg raise is negative to 90°, supine and sitting bilaterally.  R. 674.

Although the ALJ gave no weight to Dr. Chodosh's opinion that Plaintiff's back impairment caused no functional limitations, R. 29, the ALJ implicitly did not totally discount Dr. Chodosh's objective medical clinical findings that are consistent with other medical evidence discussed by the ALJ.  R. 27-30.  The ALJ expressly found that Plaintiff "has a severe back impairment, and is limited to some extent by this impairment."  R. 29.

The ALJ also found that Plaintiff's back impairment required conservative treatment with muscle relaxers and analgesics and that none of Plaintiff's physicians felt that her degree of back pain warranted more aggressive treatment such as the consistent use of narcotic pain medication, referral to physical therapy, or hospitalization.  R. 28.  *See* Sheldon v. Astrue, 268 F. App'x 871, 872 (11th Cir. 2008) (unpublished) ("A doctor's conservative treatment for a particular condition tends to negate a claim of disability.  Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996)"); *see also* Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining that ALJ properly discounted complaints of disabling pain where, among other, factors, claimant only took aspirin, Motrin, Tylenol, and Darvocet).  Further, Plaintiff performed a range of daily activities that were at least consistent with the ability to perform a limited range of light work.  *See* Macia, 829 F.2d at 1011.

Based on his consideration of the objective medical evidence and Plaintiff's daily activities, the ALJ reasonably assessed that Plaintiff was capable of performing a limited

range of light work despite her back impairment. The ALJ considered Plaintiff's difficulties with performing postural activities and reduced Plaintiff's RFC to work that required no more than occasional climbing of ramps, stairs, ropes, ladders, or scaffolds, or crouching. Weight limitations were also considered. R. 26. Notwithstanding, Mr. Capps testified that Plaintiff would be capable of returning to her past relevant light, semi-skilled work as a lens fabricating machine tender, supervisor, and administrative clerk. R. 30-31, 97-98. The ALJ accepted Mr. Capps' testimony. R. 31. Substantial evidence supports the ALJ's reduction of Plaintiff's physical RFC and overall RFC assessment.

## VII. Conclusion

Considering the Record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law. Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be **AFFIRMED.**

IN CHAMBERS at Tallahassee, Florida, on July 8, 2013.

**s/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**